Valentine W. **PULASKI**, Appellant,

v.

Robert H. **FINCH**, Secretary of Health,
Education and Welfare, United States
of America.

Nos. 17535, 17536.

United States Court of Appeals
Third Circuit.

Argued May 8, 1969.

Decided Aug. 7, 1969.

W. J. Krencewicz, Shenandoah, Pa.,
for appellant.

Merna B. Marshall, Asst. U. S. Atty.,
Philadelphia, Pa. (Drew J. T. O'Keefe,
U. S. Atty., Philadelphia, Pa., on the
brief), for appellee.

Before McLAUGHLIN, KALODNER
and VAN DUSEN, Circuit Judges.

### OPINION OF THE COURT

KALODNER, Circuit Judge.

This is an appeal from an Order of the
District Court granting summary judg-
ment for the defendant Secretary in an
action to review[1] denial of disability
benefits to the plaintiff Valentine W.
Pulaski.

The following facts are relevant to
our disposition:

On August 20, 1961, Pulaski collapsed
at a bowling alley in Shenandoah, Penn-
sylvania, and was admitted to the Locust
Mountain State Hospital. At the time
of his admission, he was "very confused,
rambling, agitated," "violent," and "dis-
oriented." His condition was diagnosed
as "Acute Mental Depression," and he
was transferred on August 30, 1961, to
the Danville State Hospital.

Pulaski remained in the Danville Hos-
pital until he was released, after 20 elec-
tric shock treatments, on a trial visit
December 22, 1961. The Danville Hos-
pital Report, dated January 4, 1962, stat-
ed that physical examinations had been
"essentially negative," but that Pulaski
was suffering from symptoms of "per-
secution, confusion, depression, impaired
memory and poor judgment." The di-

---

1. The action was brought under § 205(g) of the Social Security Act, 12 U.S.C.A. § 405(g).

agnosis was "Involutional Psychotic Reaction." His prognosis was "fair", and he was said to be "in a fairly good remission. He may be able to adjust to an employment situation provided there is a limited amount of stress involved in the work."

On December 13, 1961, prior to his trial release from Danville, Pulaski applied for Social Security disability benefits,[2] giving a "nervous breakdown" as his impairment, but benefits were denied on March 29, 1962, on the ground that he was not disabled. Pulaski then filed a request for reconsideration, stating that he became "very dizzy and tired" whenever he had to work. On September 22, 1962, benefits were again denied on the ground that although he was suffering from a mental impairment, it was not severe enough to be disabling. The report upon which the denial of reconsideration was based diagnosed Pulaski's condition as being "schizophrenic reaction, mild." The only mention of any physical impairment was of Pulaski's claim that work made him dizzy and tired.

On March 5, 1963, a *de novo* hearing was held at Pulaski's request, before a Hearing Examiner of the Department of Health, Education and Welfare ("HEW"), at which he testified that he suffered from severe headaches and dizziness. He stated that while he had experienced such complaints for many years, they had grown much worse since his nervous breakdown in August 1961. He testified that since his breakdown, he had tried two jobs—shovelling coal and digging graves—but had had to give both up; that because of his condition he no longer drove a car, except once a week to have Sunday dinner with his daughter.

In addition to the two hospital reports referred to above and Pulaski's testimony, reports by two doctors and an HEW Claims Representative Trainee were admitted into evidence. The report of the Claims Representative was mostly descriptive and was apparently based mainly on statements made by Pulaski to him. The Representative reported that Pulaski had "[n]o obvious defects or signs of pain or discomfort."

A report from a Dr. Coughlin, dated July 18, 1962, diagnosed Pulaski's condition as "Schizophrenic Reaction, Paranoid Type." Dr. Coughlin thought that Pulaski's condition was "static," and that he was "unable to maintain any type work because of mental condition."

A further report on August 21, 1962, by a Dr. Delehanty, who examined Pulaski for HEW recounted Pulaski's past and present medical history. Dr. Delehanty then concluded:

"[T]his man obviously had build [sic] up to an acute schizophrenic reaction. He has been given electric shock therapy and at the present time, is on Thorazine. Presently, I feel he is in a remission from this illness, and how well he would adjust to everyday life, without Thorazine, is a problem, of course!"

The Trial Examiner, on April 17, 1963, found that the treatment while Pulaski was hospitalized in 1961 had "arrested" "the acute phase" of his mental illness. The Examiner concluded that there were "no significant physical complaints" apart from headaches and dizziness,

2. Pulaski sought disability and/or disability insurance benefits under §§ 216(i) and 223 of the Social Security Act, 42 U.S.C.A. §§ 416(i) and 423. At the time Pulaski initially filed his application, "disability" was defined by § 416(i) and § 423(c)(2) as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." As is discussed subsequently in the text, this definition was amended in 1965. Sections 416(i)(1) and 423(d)(1)(A) now define "disability" as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

and that since Pulaski had suffered from the latter for nearly 20 years, they could not be considered a disabling impairment. The Examiner's ultimate conclusion was that "there is not an adequate medical basis for holding the claimant to be unable to engage in any substantial gainful activity."

This decision was affirmed by the Appeals Council on May 8, 1963. The Council found that (1) Pulaski had suffered an "involutional psychotic reaction" in August 1961, but that this had been in remission since his release from the Danville Hospital; (2) there was no "objective medical evidence" that Pulaski suffered from headaches or dizziness; (3) there was no evidence that Pulaski's 10% Veterans Administration ("VA") mental disability rating had been increased despite a re-examination by the VA in January 1963;[3] and (4) Pulaski was physically able to do janitorial and other related work, such as he had been doing immediately prior to his breakdown.

Pulaski then commenced an action in the District Court for review of the Secretary's determination.[4] The District Court held that "this matter should be remanded to the Secretary for a rehearing" since in its view the various items in the record, while in conflict to some degree, all supported Pulaski's contention that he was disabled.

In doing so it said:

"This Court is not satisfied that the Secretary's decision on the medical issue of claimant's disability is supported by substantial evidence but in view of the somewhat conflicting opinions contained in the record the Court feels that the Secretary should have an opportunity to review these opinions and

obtain additional medical evidence to clarify the point."

Upon remand, a new hearing was held before a different Hearing Examiner. The Examiner called as a witness a Dr. Hansen, a specialist in psychiatry and a medical advisor to the Bureau of Hearings and Appeals of the Social Security Administration. According to a letter sent to Dr. Hansen asking him to appear as a witness, "the medical evidence tentatively selected for inclusion in the record of this case" was transmitted to him as a basis for his testimony. An examination of the record, however, does not reveal what evidence was in fact sent to Dr. Hansen. The letter stated that "[t]he critical period in this case is a period prior to or within the three months after December 13, 1961, which was the date the claimant's application was filed."[5]

During the hearing, at which Dr. Hansen appeared as the only witness, the Trial Examiner made two things quite clear: (1) he was only interested in whether Pulaski had become disabled prior to March 13, 1962; and (2) he was only interested in any mental impairment that Pulaski might have. (Administrative Transcript at 132–33, 135, 164). Dr. Hansen's testimony, based on whatever records had been sent to him, was in substance as follows:

Pulaski had been a neurotic at least since teenage, but there was no evidence of any psychosis prior to August 1961. Further, there was no showing of the degree of Pulaski's mental impairment prior to August 1961, though Dr. Hansen noted that the VA had rated it at only 10%. Dr. Hansen concluded that Pulaski had undergone an acute psychotic episode in 1961, but he thought "involutional psychotic reaction" was perhaps a

---

3. When the Appeals Council filed its first decision the record revealed only that Pulaski was receiving a 10% VA disability pension for "headaches." The records of the Veterans Administration had not been requested by either party and were not before either the Trial Examiner or the Appeals Council.

4. Civil Action No. 34593, E.D.Pa.Appeal No. 17535 relates to this action.

5. Prior to July 30, 1965, the disability must have occurred prior to three months from the time the application was filed in order for the claimant to be entitled to benefits.

more accurate diagnosis than "schizophrenic reaction" for what had occurred. He rated Pulaski's impairment as 100% while he was hospitalized, but stated that when the hospital reported that Pulaski was "in fairly good remission" this meant that "he was well enough to leave." Dr. Hansen could not estimate the degree of Pulaski's mental impairment following his release from the hospital, but saw "nothing that would indicate that he was tremendously impaired following his recovery from the hospital." (Administrative Transcript at 154). Dr. Hansen found no evidence that Pulaski had suffered another psychotic episode. He had no opinion as to whether Pulaski was disabled. (Administrative Transcript at 163).

Pulaski presented no witnesses and did not cross-examine Dr. Hansen. However, statements of two doctors who had examined Pulaski were admitted. One was by a Dr. Moyer, who had treated Pulaski for some time. Written on a prescription blank, dated February 5, 1965, it said:

"Since his [Pulaski's] discharge [from Danville State Hospital] he has been under my care through VA Administration & has been on Thorazine and Mediah[?] for Headache—since that time; He is totally disabled."

The other statement submitted by Pulaski was a letter from a Dr. Kazlauskas, who had examined him on February 12, 1965. It related his medical history and concluded:

"It is my impression that Mr. Pulaski currently represents a Depressive Reaction. It would seem that some of his somatic complaints represent equivalents of depression. It is my opinion that he is disabled at this time and needs treatment. His prognosis is guarded."

In addition to the above, the Examiner had various other documents admitted into the record. One of these, a "State Mental Institution Report," dated March 27, 1963, stated that Pulaski was capable of engaging in full-time employment. It should be noted, however, that this was a report submitted to the Schuylkill County Board of Assistance at a time when Pulaski was seeking unemployment compensation. Thus, it was to Pulaski's benefit that the report state that he was not disabled. Moreover, the record reveals that Pulaski's request for unemployment compensation was originally denied on the ground that he was disabled, but that ultimately he was granted such compensation for a short time. The fact that Pulaski sought and obtained unemployment compensation at a time when he was allegedly disabled was a factor considered by the Trial Examiner and the Appeals Council in finding that Pulaski was not disabled.

Critical documents admitted by the Examiner were the VA records relating to Pulaski. These records showed that while he was in the service, he suffered from "psychoneurosis," headaches, and stomach pain, for which he had been hospitalized. Physical tests at that time were essentially negative, but he was discharged in 1945 as "unfit for service" due to a "personality disorder, constitutionally determined." He was subsequently given a 10% disability rating for service-connected mental impairment.

In November 1947, Pulaski was again examined by the VA. At this time his mental disorder was diagnosed as "anxiety reaction, moderate," but his disability rating was not changed.

On February 15, 1963, the VA had Pulaski re-examined. At this time his mental condition was diagnosed as "Schizophrenic Reaction, Paranoid Type, In Partial Remission. Competent." His mental disability rating was raised from 10% to 30%. More importantly, however, the VA examination revealed that he was suffering from "arterial hypertension, mild"; "arteriosclerosis, generalized"; "benign prostatic hypertrophy"; and "second stage anthracosilicosis." Based on these findings, on April 15, 1963, in addition to raising Pulaski's service-connected mental disability rating, the VA awarded him a non-service connected disability pension un-

der 38 U.S.C.A. § 521 [6] based on *"permanent and total [physical] disability."* (emphasis supplied).

Based on the above evidence, the Hearing Examiner filed a "Recommended Decision" on March 11, 1965. Before and after summarizing the evidence, the Examiner noted that it was incumbent upon Pulaski to establish disability on or before March 13, 1962. Moreover, his opinion makes clear that he was concerned almost exclusively with Pulaski's mental condition. His discussion of Pulaski's physical condition was limited to the obviously incorrect statement that the VA examination of February 1963 "failed to disclose any significant physical impairment," and to the further statement that even if the 1963 examination had revealed physical impairment, this would be irrelevant since the examination was after the critical period.

The Examiner dismissed the reports of Dr. Coughlin, Dr. Moyer and Dr. Kazlauskas as conclusory. He then went on to find that the only "medically determinable condition" that might have impaired Pulaski's ability to work prior to March 13, 1962, was an "involutional psychotic reaction," from which he had made a "satisfactory recovery" by December 22, 1961.

On July 22, 1965, the Appeals Council adopted the Examiner's Recommended Decision. The Council concentrated on Pulaski's procedural contentions and on the duration of his psychotic episode; however, it did conclude that the VA's 1963 physical examination was essentially negative and that the specific findings by the VA did not support a conclusion that Pulaski's activities had been significantly impaired. The Appeals Council, like the Examiner, overlooked the fact that the VA had concluded that Pulaski was permanently and totally disabled by his physical impairments.

On August 23, 1965, the Appeals Council, *sua sponte,* reopened Pulaski's case for reconsideration in light of the 1965 amendments to the Social Security Act, effective July 30, 1965. These amendments, which applied to cases pending review on the effective date, made two significant changes relevant to the instant case. They changed the definition of disability in Sections 216(i) and 223 from "inability to engage in any substantial gainful activity * * * which can be expected to result in death or to be of long-continued and indefinite duration" to "inability to engage in any substantial gainful activity * * * which can be expected to result in death or *has lasted or can be expected to last for a continuous period of not less than 12 months."* [7] (emphasis supplied). Furthermore, as noted above, prior to the 1965 amendments it was necessary to establish that the disability occurred, at the latest, within three months after the application was filed, which in the instant case would mean on or before March 13, 1962. Under the 1965 amendments, it is only necessary that the disability occur before the Secretary reaches a final decision.[8]

In reopening the case, the Appeals Council informed Pulaski that he had 10 days in which to present evidence and comments. However, Pulaski made no new presentation to the Council. Instead, on August 27, 1965, he filed a Complaint in the District Court seeking review of the Secretary's decision.[9] On

---

6. 38 U.S.C.A. § 521(a) provides:
   "The Administrator shall pay to each veteran of * * * World War II * * * who is permanently and totally disabled from non-service connected disability * * * a pension * * *."

7. However, where the claim is based on the new definition of disability, no monthly benefits are payable for any month prior to September 1965.

8. In the instant case it is necessary that Pulaski show that the disability arose on or before March 13, 1965, the last date on which he fulfilled the requirements for eligibility under the Act.

9. Civil Action No. 38783, E.D.Pa.Appeal No. 17536 relates to this action. The two actions below were consolidated pursuant to a stipulation of the parties.

October 25, 1965, the Council filed a brief "Supplemental Decision" in which it concluded that Pulaski's "normal or near-normal behavior * * * in the nearly four years which have elapsed since his release from hospitalization leads the Appeals Council to the conclusion that his unemployment is due to reasons other than 'disability'." No mention of the VA's findings of physical impairment was made in the Supplemental Decision.

On July 30, 1968, the District Court granted the Secretary's motion for summary judgment, stating that "we cannot properly conclude that the decision of the Secretary was without any reasonable basis in law."

What has been said brings us to our disposition of the instant case.

It is clear from the record before us that it apparently escaped the attention of the Trial Examiner, the Appeals Council, and the District Court, that the VA had classified Pulaski as "permanently and totally" disabled as a result of various physical ailments.

■ Since this critically relevant and material evidence was overlooked below, we must vacate the judgment of the Dis-

trict Court and order that the case once again be remanded to the Secretary. We cannot agree with the Appeals Council that the 1963 VA examination failed to show any "significant" impairment. The VA specifically found that Pulaski was suffering from arteriosclerosis and anthracosilicosis and concluded that these impairments were of such severity as to "permanently and totally" disable him.

Since we are directing remand to the Secretary for reconsideration in light of the VA's finding of total disability, we deem it appropriate that both parties be allowed to present such evidence as may be relevant to a determination of the issue of disability.[10] In particular, since the reports of the doctors favorable to Pulaski were dismissed as *conclusory*, he may wish to submit testimony or statements that set out the reasons why these doctors concluded that he was suffering from a mental disability.

■ In light of the VA findings as to Pulaski's disabilities, and the reports of his physicians, previously recited, we deem it highly desirable that a physical and mental examination be made on the remand to the Secretary with a view to

10. Our decision in this regard is reinforced by the Secretary's indication that in view of the 1968 amendments to the Social Security Act, Pulaski will have a heavier burden on remand than he had before. Under the amendments, which would apply to this case on remand, see P.L. 90–248, § 158(e), 81 Stat. 869 (January 2, 1968), Flake v. Gardner, 399 F.2d 532 (9 Cir. 1968), Williamson v. Gardner, 395 F.2d 200 (5 Cir. 1968), an individual is under a disability

"only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence

(with respect to any individual) 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."

42 U.S.C.A. § 423(d) (2) (A), incorporated into § 416(i) (1). Furthermore, "physical or mental impairment" is now defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory techniques." 42 U.S.C.A. § 423(d) (3), incorporated into § 416 (i) (1).

We note that the new definitions seem merely to enact into the statute itself the standards previously applied by the Secretary. Insofar, however, as the Secretary interprets them as changing what must be proved by a claimant to establish disability. Pulaski must, of course, be given an opportunity to meet this changed burden.

ascertaining the state of Pulaski's physical and mental condition as of March 13, 1965.[11]

The Judgment of the District Court will be vacated and the case will be remanded for further proceedings in accordance with this opinion.

11. With respect to the Trial Examiner's use of the testimony of a "medical advisor" who had no connection with the case except to read certain medical records, we are compelled to note our disapproval of the manner in which this testimony was elicited. At the very least, fundamental considerations of fairness required that plaintiff be informed of the intended use of the "impartial" medical advisor, that he be given copies of the records transmitted to such medical advisor, and that he be given an opportunity to submit appropriate records of his own choosing for the advisor's consideration. As noted above, the record does not even reveal what records Dr. Hansen considered in reaching his conclusions as to Pulaski's condition. Such documents should appear in the record. Cf. Carroll v. Frontera Compania Naviera, SA, 390 F.2d 311, 315 (3 Cir. 1968).