**Dollie K. GOMEZ and Dollie K. Gomez for Archie J. Minkler and Jarrod W. Minkler, minors, Plaintiffs,**

**v.**

**Patricia Roberts HARRIS, Secretary of Health and Human Services, Defendant.**

**No. A 80–161 Civil.**

United States District Court,
D. Alaska.

Jan. 16, 1981.

Stanley M. Ericsson, Dept. of Health and Human Services, Washington, D. C., of counsel), for defendant.

## OPINION

FITZGERALD, District Judge.

The Secretary of Health, Education and Welfare denied social security benefits to plaintiffs. Judicial review of such decisions is provided by statute.[1] This review presents only one question. Were the plaintiffs entitled to the benefit of the secretary's new presumption of death regulation?[2] I find that they were.

### A. The Facts

The facts appear undisputed from the record. In the spring of 1969, Dollie and Byrd Minkler, a young married couple, were having financial difficulties. Byrd was in the Army. The couple was living in an expensive trailer, and Dollie was pregnant for the second time. To save money, the couple separated temporarily. Dollie went home to Alaska to live with her family, and Byrd moved to the military post and subsequently sold the trailer.

Originally they planned that Byrd would come to Alaska to join Dollie when his tour ended in July. When he did not come, she decided to return to Washington after the birth of the baby. She planned to arrive about the end of 1969.

Meanwhile, when Byrd left the service, he went to live with his cousin Corky Smith in Rochester, Washington. Corky lived with his wife and her cousin, JoAnn Wilson. JoAnn was later rumored to have been Byrd's girlfriend. Byrd got work at the Pacific Sand and Gravel Company. He wrote to Dollie and sent her about $150 each month until October, 1969. That month he sent her less, and in November when he was seasonally laid-off from the gravel company, despite Dollie's letter telling him of the birth of their son, he wrote only once and sent only $20. On December 1, 1969, he filed for divorce in Washington, established inability to obtain personal service of process on Dollie, and made arrangements for service by publication.

On December 22, 1969, Corky Smith was supposed to go pheasant hunting with friends. However, those plans were cancelled, and instead, he woke Byrd and asked him to go duck hunting. According to Corky's later statement which was confirmed by polygraph, he and Byrd got into

Rene Gonzalez, Acting U. S. Atty., D. Alaska (Milton L. Moss, Asst. U. S. Atty., Anchorage, Alaska, Randolph W. Gaines,

1. 42 U.S.C. § 405(g) (1979).

2. 20 C.F.R. § 404.721 (1980).

a boat on the swollen and dangerous Chehalis River. The turbulence of the water caused the boat to overturn. Corky made it to the bank but Byrd did not. Corky spent half an hour looking for Byrd, and then reported the accident to the Lewis County Sheriff's Office. A search followed but officials were unable to find the body. Only the boat, part of Byrd's jacket, and some shotgun shells were recovered. A friend of Byrd's immediately notified Dollie in Alaska and she travelled to Washington, hearing then for the first time about the divorce plans. She returned to Alaska soon thereafter believing that Byrd had drowned.

In January 1970, Dollie filed with the Social Security Administration for survivors' insurance benefits. In September, the administration denied the application on the basis that Byrd's death had not been established. The administrator concluded that Byrd had "unemployment problems, financial problems, and marital difficulties which could have given him reason to disappear in an apparently fatal accident." Apparently the decision relied upon the facts that Corky Smith's statement lacked detail, that the sheriff's office would not vouch for Smith's reliability and had not yet closed the case, and that JoAnn Wilson said that she believed that Byrd had gone to Canada.

In January, 1974, armed with a certificate of presumptive death issued by the coroner of Lewis County, Dollie[3] applied for benefits again. Seven months later, the administration found that the coroner had used no new evidence in coming to his conclusion and once again denied the application.

On January 12, 1977, more than seven years after the alleged drowning of Byrd, Dollie made her third application. This time she relied on the presumption of death as stated in the agency's regulations. She presented a detailed statement from eye-witness Corky Smith describing the death of Byrd Minkler along with the information that he had taken and passed a polygraph test administered by the sheriff's department which had earlier refused to vouch for his credibility. The sheriff had now closed the case presuming death. She obtained signed statements from Byrd's real father and two step-fathers, from Corky Smith's wife, and from two of Byrd's life-long friends to the effect that none of them had seen or heard from him since the alleged drowning, that they would have expected to hear from him had he been alive, and that they believed him dead.

The agency's investigation disclosed that of those close to Byrd in 1969, only two thought him still alive. Byrd's mother, Lois Gloyd, had spent much time in the intervening seven years searching for him and thought that she had seen him once entering a tavern in Watts Lake, Yukon Territory. However, she had been afraid to follow him inside, and her other inquiries in the area had been unsuccessful. She had not otherwise seen or heard from him despite great effort. JoAnn Wilson also believed that Byrd was still alive but had had no contact with him since 1969 and knew of no one who had.[4]

In its initial and reconsidered determinations, the Social Security Administration denied Dollie's application. These decisions were upheld by the administrative law judge, who decided the case without a hearing. That decision became final in April, 1979 when the Appeals Council refused her request for a review.

■ This litigation followed in June, 1979, when Dollie filed a complaint seeking judicial review of the council's decision under 42 U.S.C. § 405(g). Cross-motions for summary judgment[5] were filed, and the

---

**3.** In the interval she had remarried and changed her surname to Gomez.

**4.** In this third report by the SSA, for the first time the item of information appears that Byrd had been called to testify against Corky in a criminal prosecution for poaching. The trial was scheduled for shortly after Byrd's disappearance. It was dropped. The SSA cited it seven years later as a possible reason for Byrd's disappearance. However, some citizens of Lewis County believed that it had given Corky a motive to murder Byrd.

**5.** The Ninth Circuit has pointed out that an action brought under 42 U.S.C. § 405(g) is a "review", as the statute does not contemplate a summary judgment procedure. In a 405(g) review, the court is confined to the pleadings and the record as it appeared before the agency and may not entertain additional factual material in the form of affidavits which are allowed under FRCP 56. *McMullen v. Celebrezze*, 335 F.2d 811, 813–14 (9th Cir. 1964), *cert. denied* 382 U.S. 854, 86 S.Ct. 106, 15 L.Ed.2d 92 (1965); *see also Baker v. Richardson*, 327 F.Supp. 349 (M.D.Fla.1971).

government moved for affirmance as well.[6] Dollie contended that she had been unjustly deprived of the benefit of the presumption of Byrd's death. The government contended that the agency's interpretation of its own regulation was not judicially reviewable or in the alternative that the decision should be affirmed since it was supported by substantial evidence.

B. *The Legal Standard for Judicial Review of Agency Action Under 42 U.S.C. § 405(g)*

The survivors' benefits for which Dollie and her children have applied fall under Title II of the Social Security Act. Such applicants carry the burden of establishing their rights.[7] Here, the claimants must establish that Byrd Minkler is dead in order to show that they are survivors.

■■■ To structure the dispensation of these benefits, the Secretary of Health, Education and Welfare has the power to promulgate "proofs and evidence" regulations with the force of law.[8] Such a regulation, the one governing the presumption of death, lies at the heart of this case. The courts may review agency findings of fact made under such regulations only for the extent of a claimant's conformity with them and for the validity of the regulations themselves.[9] An administrative agency's interpretation of its own regulation is of controlling weight unless that interpretation is plainly erroneous or inconsistent with the regulation.[10]

The agency is the finder of fact, and the body which makes the decision.[11] When such a decision is reviewed judicially, the court may determine only whether the secretary's findings of fact are supported by substantial evidence on the record as a whole.[12] If they are, ordinarily, the secretary's findings are conclusive. However, even when there is substantial evidence to support the findings, the decision may be set aside if improper legal standards were employed in arriving at it.[13]

C. *The Established Judicial Power to Interpret the Presumption of Death Regulation.*

■■■ The secretary argues that since the statute limits review of a regulation to conformity and validity, Congress has expressly interdicted judicial interpretation. This contention is unsound. Precedent in this circuit reflects that the courts have undertaken to interpret HEW's regulations governing presumptive death.[14] The secretary's argument that "conformity" equals "substantial evidence" is without merit. The interpretation of law is uniquely within the proper concern of the judiciary. The secretary then argues that even if the court has power to interpret the regulation, the agency interpretation has controlling weight unless it is plainly erroneous or inconsistent with the regulation.[15] HEW's earlier regulation governing presumptive death read,

---

**6.** At this point the court originally referred the matter to the United States Magistrate with the consent of the parties under the provisions of the Magistrate's Act. 28 U.S.C. § 636(c)(1) (1979). However, because of the presence of a controlling question of law and a thicket of procedural difficulties, this court has recently vacated that reference, and in this opinion decides the matter *de novo.* 28 U.S.C. § 636(c)(6).

**7.** *Mark v. Celebrezze,* 348 F.2d 289, 293 (9th Cir. 1965).

**8.** 42 U.S.C. § 405(a) (1973); *Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977).

**9.** 42 U.S.C. § 405(g) (1973); *Cheers v. H.E.W.,* 610 F.2d 463, 466 (7th Cir. 1979).

**10.** *Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 276, 89 S.Ct. 518, 523, 21 L.Ed.2d 474 (1969); *Udall v. Tallman,* 380 U.S. 1, 16 17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock and Sand Co.,* 325

U.S. 410, 413–4, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

**11.** 42 U.S.C. § 405(g) (1973); *H.E.W. v. Meza,* 368 F.2d 389, 393 (9th Cir. 1966); *Smith v. Celebrezze,* 243 F.Supp. 955, 956 (S.D.Iowa, 1965).

**12.** 42 U.S.C. § 405(g) (1973); *Harvey v. Richardson,* 451 F.2d 589, 590 (9th Cir. 1971); *Meza,* 368 F.2d at 391.

**13.** *Flake v. Gardner,* 399 F.2d 532, 540 (9th Cir. 1968).

**14.** *Christen v. H. E. W.,* 439 F.2d 715 (9th Cir. 1971); *Gardner v. Wilcox,* 370 F.2d 492 (9th Cir. 1966); *H. E. W. v. Meza,* 368 F.2d 389 (9th Cir. 1966).

**15.** *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock and Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945).

Presumption of death. Whenever it is necessary to determine the death of an individual in order to determine the right of another to a monthly benefit or a lump-sum death payment under section 202 of the act, and such individual has been <u>unexplainedly absent</u> from his residence and unheard of for a period of seven years, the Administration, <u>upon satisfactory establishment of such facts and in the absence of any evidence to the contrary,</u> will presume that such individual has died.[16] (emphasis supplied)

The ambiguity of the underlined phrases caused a number of circuits to construe them in a fashion which differed from that of the agency.[17]

This circuit in 1966 construed the regulation in the extensively cited case of *Secretary of Health, Education and Welfare v. Meza*.[18] There Lucy Meza claimed social security survivors' benefits for herself and her children. Her husband, Domingo, had originally disappeared in 1948. However, although Lucy had been unable to locate him, he had continued making payments into his social security account until 1954. At that point the payments stopped. Lucy Meza made her claim in 1962 claiming the benefit of the presumption of death regulation. The administration denied the presumption and refused the claim on grounds that Domingo had deserted Lucy and the children, and was therefore not "unexplainedly absent" since his continued payments indicated clear "evidence to the contrary" of his death. The court agreed with the agency insofar as Domingo's 1948 disappearance but found that as there was no explanation for the second disappearance in 1954, the agency had failed to rebut the presumption.

In reaching this conclusion, the court noted:

Read literally, the regulation seems to say that the presumption of death never arises unless it is shown that the absence is unexplained. We do not, however, accept that reading, as it would place an impossible burden of showing a negative

upon an applicant such as Lucy. *The most that the applicant can be expected to do is to show,* as Lucy did, *that the applicant has no explanation.* We think that *the true meaning of the regulation is that when the facts show that a person has been absent from his residence and unheard of for a period of seven years, a presumption arises that he is dead.* Such a presumption is based upon the fact that people do not ordinarily disappear for no apparent reason and sever a long established pattern of living and all contacts with family and friends. (emphasis supplied)[19]

The court again had occasion to deal with the regulation in the case of *Gardner v. Wilcox*, 370 F.2d 492 (1966). There a husband of 16 years standing disappeared in 1953. He was facing an embezzlement charge at the time. His car was found beside a rapidly flowing river exactly where he said that it would be in a suicide letter to his wife. His body, however, was never recovered. No one had since heard from him. In claiming survivors' benefits his wife invoked the presumption of death regulation. The agency refused it and denied the claim, reasoning the husband's disappearance was not unexplained in that he could be a fugitive from justice. The district court reversed the agency, but on appeal, the court ordered a remand to the secretary:

... when the facts show that a person has been absent from his residence and unheard of for a period of seven years, a presumption arises that he is dead. The burden of explanation then shifts to the Secretary...

The trouble in this case is that the hearing examiner apparently has misconceived the extent of his fact-finding function. From his decision and colloquy with counsel at the time of the hearing we are convinced that in his view, if *any* explanation is forthcoming, then it must be said as a matter of law that the absence is not unexplained.

---

16. Social Security Administration, Regulation 4 § 404.705 quoted in *Smith v. Celebrezze*, 243 F.Supp. 955, 956 (S.D.Iowa, 1965).

17. *See e. g. Edwards v. Califano*, 619 F.2d 865, 869 (10th Cir. 1980); *Johnson v. Califano*, 607 F.2d 1178, 1182 (6th Cir. 1979); *Aubrey v.*

*Richardson*, 462 F.2d 782, 784 (3rd Cir. 1972); *H. E. W. v. Meza*, 368 F.2d 389, 392 (9th Cir. 1966).

18. 368 F.2d 389.

19. *Id.* at 392.

The burden thus was placed on the claimant to establish that the absence was "unexplainable other than on the basis of death."

This position we rejected in *Secretary of Health, Education and Welfare v. Meza*, as placing an impossible burden on the claimant.[20]

In both cases the circuit remanded to the agency with directions that the benefit of the presumption of death regulation be properly applied. In both cases the court made it clear that the presumption shifted the burden of proof to the agency which could overcome it only with evidence that it was more likely than not that the missing person was alive or by proof that would rationally explain the anomaly of disappearance in a manner consistent with continued life.[21] The *Gardner* court stated that, although the secretary now argued that the agency had in fact engaged in such a balancing process, and that the determination should therefore be upheld, the record was bare of any support for that contention, and that the hearing examiner had simply refused the presumption and ended the matter there.[22]

In short, the claimant had only to show that she had no explanation for the disappearance of the wage-earner, other than death, that the wage-earner had been absent from his residence and had not been heard of for a period of seven years in order to obtain the benefit of the presumption. The burden of proof then shifted to the agency to show that it was more probable than not that the missing person was alive.

### D. The New Regulation

Effective June, 1978, the previous regulation was replaced:

§ 404.721 Evidence to presume a person is dead.

If you cannot prove the person is dead but evidence of death is needed, we will presume he or she died at a certain time if you give us the following evidence: . . .
(b) Signed statements by those in a position to know and other records which show that the person had been absent from his or her residence for no apparent reason, and has not been heard from, for at least 7 years.[23]

The new regulation retains the requirements that the missing person be gone from his or her home for no known reason, and unheard from for a period of seven years. It establishes that the claimant must produce evidence to this effect. It specifies what evidence will satisfy this requirement: "signed statements by those in a position to know and other records." This operational definition replaces one of the ambiguous phrases that had proven troublesome in the past: "upon satisfactory establishment of such facts." Finally, the regulation eliminates the most vexatious of the older phrases, ". . . and in the absence of any evidence to the contrary." This modification meets and deals with the judicial criticism that a literal reading of the old regulation required the claimant to prove a negative thus making the burden impossible to meet.[24]

In brief then, the new regulation deals with the ambiguities of its predecessor by attempting clearly to place the burden of proof. It eliminates the question of "evidence to the contrary" from the presumption-granting process which several circuits had already accomplished in the interpretation of the earlier regulation.[25] Obviously, the presumption is rebuttable by the terms of the regulation. Once the con-

---

**20.** *Gardner v. Wilcox*, 370 F.2d 492, 494 (9th Cir. 1966). The court went even further in its application of the presumptive death regulation in the case of *Christen v. H. E. W.*, 439 F.2d 715 (9th Cir. 1971), saying that an 11½ year absence with accompanying silence was enough to presume death even in the face of evidence of flight. ". . . we cannot go along with the Department's apparent view that one achieves immortality by known flight."

**21.** *Gardner*, 370 F.2d at 494; *Meza*, 369 F.2d at 392.

**22.** 370 F.2d at 494.

**23.** 20 C.F.R. 404.721 (1980).

**24.** *Gardner*, 370 F.2d at 494. *See also Edwards v. Califano*, 619 F.2d 865, 869 (10th Cir. 1980) and *Johnson v. Califano*, 607 F.2d 1178, 1182 (6th Cir. 1979).

**25.** *See e. g. Edwards*, 619 F.2d at 869 (10th Cir. 1980); *Johnson*, 607 F.2d at 1182 (6th Cir. 1979); *Aubrey*, 462 F.2d at 782 (3rd Cir. 1972); *Meza*, 368 F.2d at 392 (9th Cir. 1966).

ditions giving rise to it are met, "evidence to the contrary" must be presented to the hearing examiner if the agency contests benefits. Thus, the new regulation does not alter the substance of the earlier decisions in this circuit.

The attempt to reintroduce the "absence of any evidence to the contrary" standard, which the government makes here, in effect asks that a claimant be required to present signed statements and records not "from those in a position to know," but rather from "everyone who might be in a position to know" which decisively eliminates the possibility that there is some explanation, other than death, for the disappearance of the missing wage-earner. This analytical error becomes manifest in the administrative record at the point where the ALJ finds "Certainly, it cannot be said that claimant disappeared 'for no apparent reason', or as the law formally stated 'in the absence of evidence to the contrary'."[26] To read the regulation in this way recreates the proving-a-negative-impossible-burden test interdicted by *Meza* and *Gardner*. The secretary's interpretation of the regulation is clearly erroneous in that it departs from the case law long established in this circuit.

The secretary's interpretation and application of the law in this case is also inconsistent with the plain language of the new regulation. The interpretation urged by the agency ignores the introductory words of the sentence and thus fails to implement the simplest and most direct reading of what is required to show absence for no apparent reason, *i. e.* that it be attested to in the statements from those in a position to know which the claimant must present. Thus, even if there is substantial evidence to support the secretary's decision, it must be set aside since an improper legal standard was relied upon to reach it.[27]

E. *The Claimant is Entitled to the Presumption.*

■ Dollie obtained signed statements from a number of people close to Byrd.

Included were his real father and his two stepfathers. All said that they had not heard from him for over seven years, knew of no one who had, and believed that he had not returned home during that time period. His real father and first stepfather asserted that they would have expected to hear from him in that time period had he been alive, and believed that he was dead. His second stepfather had traveled with his mother as she searched for him in Canada. He had not seen or heard from Byrd and also believed that he was dead. Dollie also obtained statements from two of Byrd's life-long friends. Finally she submitted statements from two of the three people with whom Byrd was living when he died, his cousin, Corky, and Corky's wife.

Dollie actually obtained much more than the minimally required statement from Corky. He gave a detailed sworn account of the circumstances of what he believed to be Byrd's death by drowning in the Chehalis River. Other records she introduced indicated that Corky had taken and passed a polygraph test on the accuracy of his account of Byrd's death, and that the sheriff of Lewis County had closed the case, satisfied that Byrd Minkler had been drowned accidently. Finally, she obtained and introduced a death certificate from the coroner of Lewis County which listed Byrd's death as "presumptive death—body not recovered" on December 23, 1969.

Including her own, Dollie presented signed statements from eight people "in a position to know" which asserted the necessary elements under the regulation. She also presented four "other records" of impressive weight. Under the regulation as I read it, the plaintiffs more than met the requirements to raise the presumption of Byrd's death.

■ However, the presumption is rebuttable, and the testimony of Lois Gloyd and her possible sighting of Byrd, while of dubi-

---

**26.** Administrative Records at 11.

**27.** *Flake v. Gardner,* 399 F.2d 532, 540 (9th Cir. 1969).

ous value,[28] must be considered in that context. Since it is clearly the intent of Congress that this complex weighing and balancing of factual matters be done exclusively by the administrative agency,[29] this matter must be remanded to the secretary. The presumption must be granted and the evidence reweighed. The agency contends that the hearing examiner has already performed such a weighing process, and that there is substantial evidence to support his decision.[30] However, the record contains insufficient evidence that he did. The examiner denied the presumption and went no further since there was no proof of actual death.[31] In *Gardner*, where the government advanced an identical argument, the court of appeals ordered a remand.[32] The decision of the secretary is reversed, and the case is remanded to the department for further proceedings.

IT IS SO ORDERED.

---

**28.** Lois Gloyd's statement contains allegations of conspiracies and threats on her life in the course of her relentless search for her son. Even though Mrs. Gloyd claims to have seen her son, she never tried to speak with him. Her statement is not supported by Byrd's second stepfather who accompanied Mrs. Gloyd to Canada, nor by the investigation of the Canadian Mounted Police. There was also alleged animosity between Dollie and Lois Gloyd.

**29.** 42 U.S.C. § 405(g).

**30.** Defendant's Summary Judgment Memorandum at 11 n.4.

**31.** Administrative Record at 12.

**32.** *Gardner*, 370 F.2d at 494–95.