742 F.2d 1037
 Jody Ann GERAS, Plaintiff-Appellant,
v.
LAFAYETTE DISPLAY FIXTURES, INC., Defendant-Appellee,
United States of America, Intervenor-Appellee.
 No. 83-2728.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 27, 1984.
Decided Aug. 23, 1984.
As Amended Aug. 24, 1984.
 
 Delmar P. Kuchaes, Chudom & Meyer, Schererville, Ind., for plaintiff-appellant.
 Eric L. Kirschner, Galvin, Stalmack & Kirschner, Hammond, Ind., for defendant-appellee.
 Harold J. Krent, Atty., Appellate Staff, Civil Div., U.S. Dept. of Justice, Washington, D.C., for intervenor-appellee.
 Before PELL, CUDAHY and POSNER, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 This appeal presents as a sole issue the constitutionality of a provision of the Federal Magistrate Act of 1979, 28 U.S.C. Sec. 636(c), Pub.L. No. 96-82, Sec. 2(2), 93 Stat. 643 (1979), which permits magistrates with the consent of the parties to try civil cases and to enter judgment with respect to them. Jurisdiction for this suit in the district court was based on diversity of citizenship, 28 U.S.C. Sec. 1332. The plaintiff sued on theories of negligence, breach of implied warranties and strict liability in tort. The case was filed on November 30, 1982. On February 3, 1983, the district court referred the matter to the United States magistrate for the Northern District of Indiana for all further proceedings under 28 U.S.C. Sec. 636(c). The plaintiff and defendant consented to trial of the case before the magistrate. A jury trial was held before the magistrate on August 22 and 23, 1983, and a verdict was returned for the defendant. The magistrate ordered the clerk of the court to enter judgment on the jury verdict, and a direct appeal to this court was taken pursuant to 28 U.S.C. Sec. 636(c)(3). The only point raised on appeal is the question whether section 636(c) of the Magistrate Act conflicts with Article III of the United States Constitution and is therefore unconstitutional. We hold that section 636(c) does not conflict with Article III and is therefore constitutional.
 
 
 2
 * Section 636(c)(1) of the Federal Magistrate Act provides that, with the consent of both parties, a United States magistrate may conduct all proceedings in a jury or nonjury civil matter and can order the entry of judgment in the case. Section 636(c)(2) provides safeguards to ensure that the consent of the parties is truly voluntary, and, under section 636(c)(6), the reference to the magistrate may be withdrawn at any time by the district court for good cause on its own motion or under extraordinary circumstances shown by any party.
 
 
 3
 After entry of judgment by a magistrate, a party may appeal directly to the appropriate court of appeals in the same manner and presumably subject to the same standards of review as an appeal is taken from a judgment of the district court. The consent of the parties allows a magistrate to exercise the civil jurisdiction granted in section 636(c)(1) and to direct the entry of judgment of the district court. The parties may also, however, at the time of the reference to the magistrate, consent to appeal on the record to a judge of the district court in the same manner and subject to the same standards of review as on an appeal from a judgment of the district court to a court of appeals. The district court may then affirm, reverse, modify or remand the magistrate's judgment. In this latter situation, a case may be reviewed by the appropriate court of appeals at its discretion only upon petition for leave to appeal by a party stating specific objections to the judgment. In either case, there is no limitation on any party's right to seek review by the Supreme Court.
 
 
 4
 Six circuits have, to date, considered the constitutionality of section 636(c) of the Magistrate Act. Panels of four circuits have held that the provision is constitutional: the First Circuit in Goldstein v. Kelleher, 728 F.2d 32 (1st Cir.1984); the Second Circuit in Collins v. Foreman, 729 F.2d 108 (2d Cir.1984), petition for cert. filed, 52 U.S.L.W. 3777 (U.S. April 2, 1984) (No. 83-1616); the Third Circuit in Wharton-Thomas v. United States, 721 F.2d 922 (3d Cir.1983), and the Fifth Circuit in Puryear v. Ede's Ltd., 731 F.2d 1153 (5th Cir.1984). The Eighth Circuit has reached the same conclusion in Lehman Brothers Kuhn Loeb, Inc. v. Clark Oil Refining Corp., 739 F.2d 1313 (8th Cir.1984) (en banc). A panel of the Ninth Circuit held that the provision was unconstitutional in Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc., 712 F.2d 1305 (9th Cir.1983), but this decision was vacated and the provision was held constitutional by the Ninth Circuit sitting en banc, 725 F.2d 537 (9th Cir.1984), petition for cert. filed, 52 U.S.L.W. 3875 (U.S. May 16, 1984) (No. 83-1873).
 
 
 5
 The essence of the claimed constitutional conflict is that the statutory provision permits magistrates to exercise the judicial power of the United States although they do not conform to the requirements of Article III of the Constitution which provides
 
 
 6
 The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.
 
 
 7
 The constitutional guarantees of tenure during good behavior and of protection against reduction in compensation are the bulwarks of independence of the federal judiciary against reprisal, fear of reprisal or undue influence from any quarter and particularly from the other branches of the federal government. Judicial independence is crucial to the preservation of our system of government as has been demonstrated throughout the history of the Republic. Despite the current pressure exerted by unprecedented docket burdens in a litigious society, no "work emergency" is adequate grounds for undermining the constitutional guarantees of an independent judiciary.
 
 
 8
 In contrast to the constitutional guarantees of life tenure afforded to federal judges by Article III, magistrates serve for only eight-year terms but may be reappointed. Magistrates are appointed by vote of a majority of the district judges sitting in a particular district or, lacking such a majority, by the chief judge. A magistrate may be removed by the district judge or judges during his or her term only for incompetency, misconduct, neglect of duty or physical or mental disability. 28 U.S.C. Sec. 631. The compensation of magistrates may not be reduced during a term below the compensation fixed at the beginning of the term, 28 U.S.C. Sec. 634(b), although Congress could presumably effect such a reduction by repealing or overriding this statutory provision.II
 
 
 9
 The case before us concerns the exercise of the federal judicial power in adjudicating private, state-created rights under the federal diversity jurisdiction granted in Article III. This case therefore specifically concerns the same type of rights as were at issue in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 71, 102 S.Ct. 2858, 2871, 73 L.Ed.2d 598 (1982)--in Marathon, the right to contract damages and, in the case before us, the right to tort damages. None of the exceptions delineated by the plurality in Marathon as exempt from Article III strictures is therefore applicable: the "territorial courts" including the District of Columbia courts, the courts-martial and the administrative tribunals, which primarily adjudicate "public rights." Id. at 63-70, 102 S.Ct. at 2867-71. Cf. Wharton-Thomas, supra, 721 F.2d at 930 (reaching the constitutional issue although case, based on the Federal Tort Claims Act, was arguably limited to a federally-created right).
 
 
 10
 The central issue in determining the constitutionality of section 636(c) is therefore whether the magistrates, in exercising the powers granted to them in this section, are performing the functions of federal judges. Because they clearly do not enjoy the Article III judicial protections, if they are acting as judges, then the provision is unconstitutional. If, however, they are in fact acting as "adjuncts" and are not exercising the federal judicial power, then this provision is constitutional.[1] In order to make this determination, we must examine several facets of the functioning of the magistrates. In Marathon, the Supreme Court declared the Bankruptcy Act of 1978 unconstitutional because it conferred federal judicial powers on bankruptcy judges who were not accorded Article III protections. This decision, therefore, provides a model for determining whether the magistrates are to be considered as adjuncts to the district court or as judges in fact, if not in name.
 
 
 11
 In addition, it is possible to identify two preeminent values which the Article III protections are intended to safeguard, much as did the Ninth Circuit in Pacemaker, 725 F.2d at 541. An examination of these values illustrates whether the powers which are given to the magistrates under section 636(c) constitute an excessive delegation of authority to the magistrates so as to negate their status as adjuncts of the district judges. These two values implicated by Article III are the right of the litigant to exercise of the federal judicial power by an independent federal judiciary and the preservation of the separation of powers among the three branches of government.
 
 
 12
 * In considering the constitutional values to be maintained, we must first examine the proposition that the required voluntary consent of the parties to trial of civil matters before magistrates obviates the need for Article III protections. The fact that magistrates can exercise their authority only with the litigants' consent is a significant distinction from the nature of the authority exercised by the district judges. The statute attempts to ensure the voluntary character of this consent and specifically provides that the district court is authorized only to inform the parties of the alternative of a reference to a magistrate and is then forbidden to persuade or induce the parties to accept the reference. In addition, litigants retain the option of asking the district court, albeit only under extraordinary circumstances, to withdraw the reference.[2]
 
 
 13
 The element of required consent in section 636(c) serves to distinguish this provision from both the Bankruptcy Act at issue in Marathon and the section 636(b) provision at issue in United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). In fact, in Marathon, the Court used the absence of any requirement for the parties' consent as one of the three primary characteristics distinguishing the 1978 Bankruptcy Act from the earlier system of bankruptcy adjudication. Under the prior law, the consent of the parties was needed to authorize bankruptcy referees to exercise jurisdiction over controversies beyond those involving property in the possession of the court. 458 U.S. at 79-80 n. 31, 102 S.Ct. at 2875-76 n. 31. See also 458 U.S. at 91, 102 S.Ct. at 2881 (Rehnquist, J., concurring).
 
 
 14
 The magistrate reference system is evidently intended to provide a quicker and less costly alternative to the usually more delayed adjudication in a district court. Congress explicitly stated that one of the purposes of the 1979 revisions was to "improve access to the federal courts for the less-advantaged." S.Rep. No. 74, 96th Cong. 1st Sess. 1, reprinted in 1979 U.S.Code Cong. & Ad.News 1469, 1469. While this objective may seem to be desirable, some opponents of the system have argued that its workings may result in a double system of justice--a second-class magistrate system for the impecunious and a first-class district court system for the wealthy and for large corporations. Pacemaker, 725 F.2d at 553-54. Such a possibility, however, seems to be little more than speculation, at least at this time. In fact, the unlikelihood of this kind of development is apparently bolstered by the fact that parties, regardless of their wealth, often voluntarily choose to settle their disputes through recourse to the extra-judicial avenue of arbitration rather than through the costlier and often much lengthier judicial process. Arbitrated decisions may, in some instances, end up in court for final resolution, but the parties fully realize that in subsequent court litigation the arbitration award is ordinarily denied de novo consideration; instead, the court in its usual practice accords great deference to the decision of the arbitrator. See, e.g., DeCosta v. Columbia Broadcasting System, Inc., 520 F.2d 499, 505-06 (1st Cir.1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976) (equating consensual reference to magistrate with arbitration, factfinding of both being subject to "clearly erroneous" standard).
 
 
 15
 Of course, a major objection to trial of civil matters by reference to magistrates is that the exercise of the judicial power of the United States cannot depend upon stipulations of the litigants. See Pacemaker, supra, 725 F.2d at 548-52. The Constitution requires that the judicial power be exercised by Article III judges, and the objectors contend that this is a requirement of subject matter jurisdiction which is not waivable by the parties in favor of a non-Article III judge. The right of access to Article III judges, however, may be viewed more correctly as personal to the litigants and therefore subject to waiver. Pacemaker, 725 F.2d at 541-43. This characterization is also more realistic in that the issue is not an expansion of the subject matter jurisdiction of the federal courts but rather the parties' choice of the forum in which the suit, for which federal jurisdiction clearly exists, is to be litigated. Once the parties have waived their right to Article III protections, they should not be allowed to challenge the constitutionality of the provisions under which they voluntarily chose to proceed. The Pacemaker majority, in fact, pointed out that criminal defendants are permitted to waive fundamental personal rights including the right to counsel, the right to trial by jury and even the right to any trial at all. Id. at 543. See also Goldstein v. Kelleher, 728 F.2d at 35.
 
 
 16
 In this connection, however, we emphasize a very important point. We do not believe that reference of civil matters to magistrates can be sustained against constitutional challenge unless an alternative of trial before an Article III judge is maintained for all litigants as a realistic and viable alternative. If a litigant were required to wait ten years for a trial before an Article III judge in lieu of a prompt trial before a magistrate, we would have little difficulty finding that the constitutional grant of jurisdiction had been frustrated. The dissenters in Pacemaker point out the very real objection that
 
 
 17
 In the Magistrates Act Congress has delegated to judicial councils the power to create magistrate positions and thereby has abdicated [the] constitutional responsibility [to create judgeships]. In practical terms, this abdication reduces the pressure on Congress to create more Article III judgeships, and increases the pressure on district courts to escalate the use of magistrates.
 
 
 18
 725 F.2d at 549.
 
 
 19
 It is entirely possible that the agencies of judgeship creation will operate as the Pacemaker dissenters fear. If this is the case, we can foresee the balance of constitutionality moving against the magistrate system. As long, however, as an appropriate balance is maintained between magistrates and Article III judges so that a real option of trial by an Article III judge is preserved, we cannot say that the Constitution has been violated.
 
 
 20
 Of course, a related and fundamental concern affecting the magistrate reference system is whether the consent of the litigants can ever be said to be truly voluntary. According to the dissent in Pacemaker, 725 F.2d at 553-54, such consent is not voluntary but, rather, coerced by the very pressures which led to the creation of the magistrate system--the cost and delay of litigation in the federal district courts. See also Phillips v. T.V.A. Engineering Assoc., Inc., petition for cert. filed, 52 U.S.L.W. 3910 (U.S. April 23, 1984) (No. 83-1732) (one question presented concerns coerced consent to reference to magistrate), petitioning from 725 F.2d 684 (6th Cir.1983) (mem.). These pressures might seem to render the consent of those litigants who can least afford the expense, and for whom the magistrate system was ostensibly created, of somewhat questionable voluntariness. But this concern is almost entirely speculative; there is no hard evidence of economic, or other systemic, coercion. In addition, the statute itself bends over backward to preclude undue influence by either judges or magistrates. To invalidate the magistrate reference system would only be to increase further the cost and delay of district court litigation for those--whether poor or wealthy--who prefer to litigate in district court. Such an invalidation would also deny to those who would choose a magistrate a reasonably quick and less costly alternative. Again the result of invalidation might well be to deny to less advantaged litigants access to the federal courts altogether. At the same time those who would persevere with the existing system of district courts, despite its manifest inadequacies, would be severely burdened.
 
 B
 
 21
 Consideration of the second value--the preservation of the independence of the judiciary in relation to the other branches of the government--requires an examination of several features of the magistrate system as embodied in section 636(c). We should reiterate that the use of magistrates in other contexts and for other purposes has been held to be constitutional, as in Raddatz. The use of other district court "adjuncts," such as the referees in the former bankruptcy system, has also passed the test of constitutionality.
 
 
 22
 The crucial question is whether section 636(c) presents a magistrate system which is truly an "adjunct" of the district court or one which constitutes an independent (and extra-constitutional) court system. The bankruptcy courts established by the Bankruptcy Act of 1978 have been explicitly characterized as being independent of the district courts. Marathon, 458 U.S. at 80 n. 31, 102 S.Ct. at 2876 n. 31. The bankruptcy judges were to be appointed by the President with the advice and consent of the Senate and these judges were subject to removal by the judicial council of the circuit. Not only was the jurisdiction of the bankruptcy courts independent of the parties' consent but there was no procedure by which the district court could review the proceedings of the bankruptcy court while they were being carried on or could remove a case from the bankruptcy court's jurisdiction on its own initiative or upon request of the parties.
 
 
 23
 The magistrates, on the other hand, are subject to appointment and removal only by the district judges (and, in some circumstances, to removal by the circuit judicial council). While such a dependent relationship may, to some extent, implicate the independence with which the magistrates exercise their judgment, it does not implicate either the judiciary's or the magistrates' independence vis a vis the Executive or Legislative Branches. In addition, the district court retains supervisory authority over the proceedings of the magistrate, while they are in process, through its ability to withdraw the reference.
 
 
 24
 The Supreme Court in Marathon identified the most significant difference between the old and the new bankruptcy systems as being the role of the old bankruptcy referees, in fact as well as in name, as "subordinate adjuncts of the district court" in contrast to the independence of the new bankruptcy judges. Two of the relevant factors identified by the Court were that the referees were appointed and removable only by the district court and that the district court retained control by its power to withdraw a case from a referee. As the Court said, "[t]hus, even at the trial stage, the parties had access to an independent judicial officer." The dependence of the referees and of the magistrates was primarily on the judiciary, not the political branches of government. And as the Marathon plurality paraphrased Justice Blackmun's comment in Raddatz, the primary "danger of a 'threat' to the 'independence' of the [adjunct came] from within, rather than without, the judicial department." 458 U.S. at 80 n. 31, 102 S.Ct. at 2876 n. 31 (quoting 447 U.S. at 685, 100 S.Ct. at 2417 (Blackmun, J., concurring)). In other words, "subordinate adjuncts," by reason of their close dependence on independent judicial officers, are shielded against influence from the political branches of government.
 
 
 25
 In this connection, perhaps the most troubling aspect of the magistrate system with respect to its status as a mere adjunct of the district court is the fact that a magistrate can order entry of final judgment. Only the new bankruptcy system, declared unconstitutional in Marathon, also permitted a non-Article III officer to enter final judgment. But the power to enter final judgment which, in the case of the magistrates under section 636(c), can only be exercised with the consent of the parties, may be viewed more as a technical than as a substantial encroachment on the independence of the judiciary. The reason for regarding this power to enter final judgment as "technical" is that, for example, even under section 636(b)--approved in Raddatz --the judge in reality does not generally give full de novo consideration to a magistrate's recommendation. Instead, the judge proceeds in fact in a fashion not drastically different from that utilized in reviewing a section 636(c) judgment by either the district or appellate court.[3]
 
 
 26
 The First Circuit in Goldstein v. Kelleher, 728 F.2d at 35-36, pointed out that the Supreme Court has approved consensual grants of authority to masters and referees even to the point where their decisions "have the same force and effect as a judgment of [a federal district] court." Heckers v. Fowler, 69 U.S. (2 Wall.) 123, 127, 17 L.Ed. 759 (1864). In addition, judgment was entered on the referee's report pursuant to the district court's initial order of reference, and the Court essentially applied a waiver theory to prevent the litigants from subsequently challenging this authority. Id. Similarly, in Kimberly v. Arms, 129 U.S. 512, 524-25, 9 S.Ct. 355, 359, 32 L.Ed. 764 (1889), the Supreme Court held that the ruling of a master should not be disturbed "unless clearly in conflict with the weight of the evidence."
 
 
 27
 This raises the perhaps more significant question, with respect to the status of magistrates, of the type of review which a district or appellate court may give to the magistrate's determinations. This inquiry, however, does not lead to an objection of constitutional magnitude. District courts and, occasionally, appellate courts are accustomed to deferring to non-Article III officials acting as factfinders. Examples include not only administrative agencies (which fall under the administrative tribunal exception previously mentioned) but also special masters and magistrates operating under section 636(b). In Raddatz, the Court pointed out that, although the district court was to make a de novo determination with respect to the suppression of evidence, it was not required to hold a new hearing. A requirement of a new hearing would obviously defeat the purpose of the reference to a magistrate. That purpose would also be defeated by de novo consideration of a magistrate's actions under section 636(c). Deference to a magistrate with respect to fact-finding thus does not seem to implicate questions of judicial independence because the reviewing court--whether a district court or a court of appeals--would, of course, give any determinations of law full independent consideration. Thus, entry of final judgment by a magistrate is not of constitutional significance if the result is deference only to fact-finding and with full review of legal questions in the Article III courts.
 
 
 28
 Despite our view of the authority to enter final judgment as having technical significance only, perhaps some clear line of demarcation between the power of an Article III judicial officer and a magistrate is required. Such a line of distinction may be found in the allocation of the contempt power, because, under no aspect of the Magistrate Act, can a magistrate punish for contempt. 28 U.S.C. Sec. 636(e). According to section 636(e), if an individual commits an act constituting contempt of court, the magistrate must certify the facts of the incident to a district judge. The judge, after holding a hearing and evaluating the allegedly contemptuous conduct, may determine the nature and severity of appropriate punishment, if indicated. Unlike the relatively mechanical entry of judgment, the power to punish for contempt of court is the means by which many court judgments, not including the collection of money judgments, are enforced. Despite the effort of the dissent to trivialize the significance of the contempt power, it remains the primary means of enforcing many court judgments, particularly injunctions. The vesting of this power exclusively in the hands of Article III judicial officers would seem, for present purposes at least, to provide an adequate distinction between such judges and non-Article III officers. This clear line also serves to limit the ultimate exercise of judicial power to persons enjoying the constitutional guarantee of independence.
 
 
 29
 The dissent raises a number of serious arguments which we must consider carefully since the independence and integrity of the federal judiciary is too important a matter to be sacrificed to pride of opinion. As the dissent itself concedes, however, many of its arguments are quite speculative. It seems to assume that the 4% of federal trials now conducted by magistrates may grow to 40% in a process that will eventually drown the federal courts. This need not be the case; in fact the dangers are so clear and so fearsome that they are likely to be avoided. As we have said, a radical shift to trial by magistrate could easily result in a finding of unconstitutionality on the new facts. Under all the circumstances, this is not a situation where some experimentation with traditional Article III arrangements is necessarily some sort of faustian bargain.
 
 
 30
 In any event, it is ironic that, to avoid recourse to such expedients as the trial of some diversity cases by magistrates, the dissent would consider the abolition of federal diversity jurisdiction altogether. The loss to the federal scheme by ending diversity jurisdiction might far exceed any speculative loss in empowering magistrates to try these cases. We would, in effect, throw out the baby with the bath water. The point is that heavy caseloads cause losses somewhere and it is our task not to deny that losses exist but to hold them to a minimum.
 
 
 31
 In the best of all possible constitutional worlds, there would perhaps be no non-Article III judicial officers. Judicial independence and the purity of the constitutional grant of judicial power might be best assured by barring the door entirely to those unclothed with the constitutional protections. But the pressure to decide cases calls for reasonable measures in response. This does not necessarily mean a flood of new Article III judges, a drastic narrowing of the federal jurisdiction or a higher price of access to the federal courts. It may reasonably mean such programs as the Magistrate Act which are carefully designed to protect the essential values of Article III according to well accepted principles.
 
 
 32
 As a practical matter, we do not know whether the extremely rapid growth of federal litigation since the early 1960's is a relatively permanent feature of the legal environment or whether this will appear as an exceptional departure from the long-term trend. The provisions of section 636(c) seem to us to be an appropriate reaction to a crisis, the future course of which is unknown. Presumably, the creation of permanent district judgeships is something that should be keyed primarily to long-term developments as best we can discern them. The system of magistrate reference of civil cases is a flexible mechanism, which seems well-tailored to helping to absorb the surge of litigation which has caused the crisis with which we are now coping--provided, of course, that the key constitutional values can be maintained and preserved.
 
 
 33
 In light of these considerations, we conclude that magistrates continue to function as adjuncts of the district courts and that the right of individual litigants to access to Article III judicial officers, the independence of the judiciary from the executive and legislative branches and the separation of powers among the three branches of the federal government are preserved in section 636(c) of the Magistrate Act. This conclusion is valid despite the authority granted to the magistrates to hear and enter judgment in civil cases. We therefore hold that section 636(c) of the Magistrate Act is constitutional and we affirm the judgment below.
 
 
 34
 POSNER, Circuit Judge, dissenting.
 
 
 35
 Although impressed by the unbroken phalanx of opposing authority in our sister circuits, and by my brethren's reasoning, I cannot repress my conviction that 28 U.S.C. Sec. 636(c), especially in allowing magistrates to preside and enter judgment in diversity cases (provided only that the parties consent to trial by magistrate), violates the Constitution.
 
 
 36
 Article III, section 1 vests "the judicial Power of the United States ... in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish," and it also provides that "the Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." The purpose of the tenure and compensation provisions is to assure the quality and independence of the federal judiciary. The tenure provision is the fundamental one; the assurance of undiminished compensation backs it up by preventing Congress from driving the judges from office by cutting their pay. Hamilton wrote in The Federalist No. 78 that "the standard of good behavior for the continuance in office of the judicial magistracy is certainly one of the most valuable of the modern improvements in the practice of government.... [I]t is the best expedient that can be devised in any government to secure a steady, upright, and impartial administration of the laws." Experience in the two centuries since he wrote has not contradicted his view. See Lehman Bros. Kuhn Loeb Inc. v. Clark Oil & Refining Corp., 739 F.2d at 1319 (8th Cir.1984) (Arnold, J., dissenting).
 
 
 37
 Although Article III, section 1 does not say in so many words that the judicial power of the United States shall be exercised by judges rather than by bailiffs, criers, and other court employees, the implication is unmistakable. The judges can have assistants who are not themselves judges, but cannot just hand over their authority to those assistants. If they do, the assistants become judges--judges whose conditions of employment violate Article III. A district judge cannot tell his law clerk, "You try this case--I am busy with other matters--and render judgment, and the losing party can if he wants appeal to the court of appeals." The judge cannot do this even if the parties consent, and even though the statute authorizing federal district judges to appoint law clerks (28 U.S.C. Sec. 752) does not specify the duties of law clerks. In my example the law clerk is acting as a judge, though not called a judge; and the authors of Article III could not have intended to guarantee federal judges life tenure and assured compensation only if they were called "judges." Unless the word is read generically, Article III could be nullified by a change in title. Judges were called all sorts of things in 1787 besides "judge"--not only the familiar "justice" (not mentioned in the Constitution) but also "chancellor," "recorder," "commissioner," "baron," "president," "assistant," "delegate," "lord keeper," "master of the rolls," and, yes, "magistrate." What they are called is not important; what they do is important. If section 636(c) assigns judges' work to magistrates, who do not have the tenure and compensation guarantees in Article III, it violates Article III.
 
 
 38
 It is true that there have always been judicial adjuncts--officials, permanent or ad hoc, who assist judges but are not themselves judges protected by the guarantees of independence that Article III took over from English practice (described in 1 Blackstone, Commentaries on the Laws of England 258 (1765)). For example, the eighteenth-century English court of equity--which like most modern American courts was terribly overloaded--had a bureaucratic organization that gave considerable discretion to subordinate officials, the masters in chancery, who were not full-fledged judges. But with limited independence went limited authority: the Lord Chancellor reviewed the masters' decrees de novo--that is, with none of the deference that appellate courts normally give a trial judge's factfindings. See 3 Blackstone, supra, at 453-54 (1768). There have always been in the federal system subordinate officials (such as U.S. Commissioners--the predecessors to federal magistrates--and the magistrates themselves, before the passage of section 636(c) in 1979) who exercise such ancillary judicial powers as determining whether there is probable cause to issue an arrest or search warrant, setting bail, and issuing a decision that is subject to de novo review by the district judge. There have always been ad hoc judicial auxiliaries as well, such as masters and auditors, see In re Peterson, 253 U.S. 300, 312-13, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920), and administrative officers such as clerks of court, bailiffs, criers, and marshals. And naturally as judicial workloads have grown the dividing line between judges' work and adjuncts' work has shifted, the ratio of adjuncts to judges has risen, and new kinds of judicial adjunct have emerged. For example, an eighteenth-century judge did not have drafts of his opinions prepared by a young assistant; the first American law clerk was not appointed till 1875. Oakley & Thompson, Law Clerks and the Judicial Process 11 (1980). No American judge today believes that a law clerk becomes a judge by preparing an opinion draft.
 
 
 39
 But there are limits to how far the line between nondelegable and delegable judicial work can be allowed to shift without making a mockery of Article III. The proper role of the judicial adjunct, who in the federal setting may be defined as anyone who helps with the work of Article III courts but whose conditions of employment are not as prescribed in Article III, is to advise and assist the real judge. It is not to be the real judge, only called something else.
 
 
 40
 Federal magistrates are adjuncts as I have defined the term. But section 636(c) has cast them in a new role that is not an adjunct's role, by allowing them to conduct regular federal civil trials and to enter judgments that can be appealed to the courts of appeals just like any final judgment of a district court. The magistrate in a section 636(c) case does not merely recommend a decision to the district judge. The delegation to federal magistrates of this traditional function of judicial adjuncts (special masters, auditors in equity, commissioners in admiralty, etc.) is not problematic after United States v. Raddatz, 447 U.S. 667, 681-83, 100 S.Ct. 2406, 2415-16, 65 L.Ed.2d 424 (1980); see also Reciprocal Exchange v. Noland, 542 F.2d 462, 463 (8th Cir.1976). It is true that in Heckers v. Fowler, 69 U.S. (2 Wall.) 123, 17 L.Ed. 759 (1865), a patent case, judgment was entered directly on a referee's report; but "the losing party made no objections to the report," id. at 133, and the Court's opinion repeatedly describes the function of a referee as "report[ing] the result of his finding." Id. at 132; see also id. at 129-33.
 
 
 41
 Nor does the magistrate in a section 636(c) case merely write a draft of an opinion explaining the reasons behind the district judge's decision, as the judge's law clerk might do; that would not be problematic either. The magistrate conducts the trial and renders judgment as if he were a district judge (see Fed.R.Evid. 1101)--which, practically speaking, he is. Already in the District of Oregon "the magistrate's position has evolved to the point where a magistrate's duties are very similar to those of a judge.... The magistrates are automatically assigned civil matters in the same manner as judges.... Judges view magistrates as their peers and allow them to be assigned cases and duties commensurate with those of judges." Comptroller General of the United States, Report to the Congress: Potential Benefits of Federal Magistrates System Can Be Better Realized 18, 22 (GAO/GGD-83-46, July 8, 1983).
 
 
 42
 The fact that the district court "may, for good cause shown on its own motion, or under extraordinary circumstances shown by any party, vacate a reference of a civil matter to a magistrate under [section 636(c) ]," 28 U.S.C. Sec. 636(c)(6), does not convert the magistrate's decision into a recommendation. This subsection creates a power of ad hoc removal--a power presumably reserved for extreme situations--rather than a right to de novo review, or indeed any form of review, by the district judge. See Swallow Turn Music v. Tidal Basin, Inc., 581 F.Supp. 504 (D.Me.1984); Southern Agriculture Co. v. Dittmer, 568 F.Supp. 645, 646 (W.D.Ark.1983); Gomez v. Harris, 504 F.Supp. 1342, 1345 n. 6 (D.Alaska 1981). Mere disagreement with the magistrate's decision would not be "good cause" even if the statute contemplated removal after decision, which it does not seem to do. My brethren suggest in a footnote that they might be willing to read this provision very broadly. Read broadly enough, as reducing the power of the magistrate to that of recommending a decision to the district judge, subsection 6 would gut 636(c). I am sure they do not mean to go so far, but I do not know how far they do mean to go. All I am sure of is that their footnote will inject uncertainty into the practical administration of section 636(c).
 
 
 43
 Now when a magistrate presides at a jury trial of a personal-injury case between private citizens (as in this case), makes rulings on evidence, instructs the jury, enters a judgment on (or notwithstanding) the jury's verdict, perchance decides the constitutionality of a state or federal statute, and receives if his judgment is appealed the same deferential review of all factfindings (and presumably all discretionary rulings) as a regular district judge would receive, see Payne v. United States, 711 F.2d 73, 75 (7th Cir.1983); Woods v. United States, 720 F.2d 1451, 1452-53 (9th Cir.1983), he is doing the essential, nondelegable work of a judge. And to preside over a trial of a case that is within the federal courts' jurisdiction only because the parties are of diverse citizenship (as in this case) is unquestionably an exercise of judicial, not legislative, power, which completes the demonstration of unconstitutionality. My learned brethren can get no help from the cases (reviewed in Justice Brennan's plurality opinion and Justice White's dissenting opinion in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 63-70, 104-13, 102 S.Ct. 2858, 2867-71, 2888-93, 73 L.Ed.2d 598 (1982)) that allow Congress, as an incident to its substantive lawmaking powers under Articles I and IV of the Constitution, to establish non-Article III courts (such as the Tax Court or territorial courts), or administrative agencies (such as the Federal Trade Commission), to resolve certain types of dispute over the application of federal laws. A magistrate conducting the trial of a diversity case is not a judge of an Article I court created by Congress pursuant to its power to enact legislation necessary and proper to its substantive lawmaking responsibilities. He is a judge of a federal district court, which is an Article III court. And this is not just a formality. So far as diversity cases are concerned, the only thing to which section 636(c) could be necessary and proper is Congress's power "to constitute Tribunals inferior to the supreme Court" (Art. I, Sec. 8, cl. 9)--namely the federal district courts, exercising judicial power conferred by Article III.
 
 
 44
 Section 636(c) is not saved by the fact that the judgment entered by a magistrate can be appealed to Article III judges in the court of appeals (or if the parties prefer, to a district judge, 28 U.S.C. Sec. 636(c)(4)). Article III, section 1 requires that "Judges ... of ... inferior Courts" be given the same guarantees of independence as the judges of the Supreme Court. The argument for not taking this equivalence seriously is that Congress need never have created lower federal courts, and if it hadn't, all questions of federal as well as state law at the trial and intermediate appellate level would have been decided by state judges who were not covered by the tenure and compensation protections of Article III. But it does not follow that Article III protections for lower-court judges are unimportant, given that Congress has created lower federal courts. Some of the states did not want lower federal courts at all. That is why Article III did not establish such courts, but left to Congress the decision whether to establish them. See Wright, The Law of Federal Courts 2 (4th ed. 1983); 1 Records of the Federal Convention of 1787, at 124-25 (Farrand rev. ed. 1937). These states especially would not have wanted lower federal courts manned by judges who, because they did not have the guarantees of independence that are provided in Article III, might be in the hip pocket of the President, or Congress, or other federal judges.
 
 
 45
 Appellate review in the federal system leaves great power in the hands of the district judges; and as noted earlier, magistrates' decisions under section 636(c) are reviewed under the identical standards as district judges' decisions. Appellate control over the conduct of jury trials, as in this case, is especially limited. The tone in which the trial judge addresses the jurors, counsel, and witnesses; his rulings on evidence (especially evidence sought to be excluded as cumulative or prejudicial); his management of the pace of the trial; his decisions on the length and phrasing of the jury instructions; the manner in which he reads or paraphrases the instructions to the jury; his supervision of the jury's deliberations--these discretionary aspects of the trial judge's responsibility are largely beyond the power of an appellate court to correct, yet they can influence a jury's verdict. Federal district judges can even comment to the jury on the weight of the evidence (though they rarely do so nowadays). So could magistrates presiding under section 636(c).
 
 
 46
 The only thing missing from the magistrate's repertory of judicial powers and responsibilities, in any case to which section 636(c) applies (which means any federal civil case that the parties consent to have tried by a magistrate rather than a district judge), is the power to hold someone in contempt of court. We are told that by a happy coincidence this is the crucial thing--that by this, and this alone, shall a federal judge be recognized. Actually it is about as crucial as the robe. The contempt power is rarely employed in civil trials. It is rarely employed, period: out of 34,681 federal criminal proceedings begun in the 1983 reporting year, only 42 were prosecutions for contempt. See Table D-2 in the 1983 Annual Report of the Director of the Administrative Office of the U.S. Courts. The trial judge has other sanctions that usually are just as effective. He can dismiss the case if there is misconduct on the plaintiff's side or enter a default judgment if there is misconduct on the defendant's side; and to punish less serious misconduct he can bar a party from making a claim or defense or make that party pay the attorney's fees incurred by his adversary in opposing the claim or defense. These things a magistrate, too, can do in a case tried under section 636(c).
 
 
 47
 In any event there is little practical difference between a presiding judge and a presiding magistrate so far as the contempt power is concerned. Judicial interpretation of Rule 42(a) of the Federal Rules of Criminal Procedure has significantly curtailed the power of summary contempt. See, e.g., United States v. Moschiano, 695 F.2d 236, 251 (7th Cir.1982). And Rule 42(b), which governs contempt adjudications following notice and hearing, requires the judge to disqualify himself "if the contempt charged involves disrespect to or criticism of" the judge (unless the defendant consents to that judge's hearing the matter). This creates a situation similar to that under 28 U.S.C. Sec. 636(e), which allows the magistrate to certify to the district judge facts that would constitute contempt if the judge had been presiding, and empowers the judge to punish the contempt. True, I have been speaking just of criminal contempt. But section 636(e) extends to civil contempt as well (this is apparent from its last clause); and it would rarely be necessary to commit someone for civil contempt summarily. Considering the trend toward giving people charged with civil contempt procedural safeguards similar to the ones given those charged with criminal contempt, see, e.g., In re Rosahn, 671 F.2d 690, 697 (2d Cir.1982), we can safely assume that summary civil contempts are especially rare and that notice-and-hearing civil contempts are processed much like (though not identically to) Rule 42(b) criminal contempts--and therefore like contempt before a magistrate. See, e.g., Commodity Futures Trading Comm'n v. Premex, Inc., 655 F.2d 779, 782 n. 2 (7th Cir.1981); Comment, Coercive Contempt and the Federal Grand Jury, 79 Colum.L.Rev. 735, 746-61 (1979). Anyway, civil contempt is an even less common sanction in modern federal civil litigation than criminal contempt.
 
 
 48
 As a matter of logical implication from the text of the Constitution, I see no escape from the conclusion that section 636(c) is unconstitutional, especially as applied to diversity cases. But when logic points in one direction and the judges go in another, there usually is a better explanation for their action than the spirit of perversity. There is here. Since 1960, the caseload of the district courts has tripled and that of the courts of appeals has octupled, and there has not been a corresponding increase in the number of judges. The caseload has also become more varied and more difficult. The caseload crisis makes the idea of invalidating section 636(c) seem futile, unfair to the district courts, and ungrateful to Congress: in short, ill advised.
 
 
 49
 This reaction is understandable, and if I could find more play in the text and policies of Article III, section 1 than I have been able to find, I might be swayed by it. The crisis has caused federal judges to delegate more and more of their work to judicial adjuncts--to magistrates, to special masters, to law clerks, to staff attorneys (law clerks not assigned to specific judges), even to externs (law students who work for judges on a part-time basis, for course credit). One hopes it is just the delegable work that is delegated. But at a time of such extensive judicial delegation--of (not to put too fine a point on it) judicial bureaucracy--the line between a subordinate's advising and assisting the decision-maker, on the one hand, and the subordinate's actually deciding, on the other, can be a faint one, as this court noted recently in warning our district judges against overusing special masters. See Jack Walters & Sons Corp. v. Morton Building, Inc., 737 F.2d 698, 711-13 (7th Cir.1984), citing La Buy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957). But to conclude that because some judges may sometimes rubber-stamp the recommendations of their adjuncts we might as well eliminate the middleman, as it were, and allow magistrates to enter judgments directly, just as if they were the district judges and not merely the district judges' subordinates, would come close to saying that whatever is, is constitutional. We could no longer warn our district judges against the overuse of special masters or other adjuncts; realism would rule out any normative judgments regarding judicial delegation.
 
 
 50
 Although the caseload crisis is real, we are not yet at the end of our tether by any means. And there are a number of measures of indubitable constitutionality, such as abolishing the diversity jurisdiction, that Congress could take to reduce the federal judicial workload. We should not fear that if we invalidated section 636(c) we would be striking a mortal blow at the district courts. The 890 civil trials that magistrates conducted under the authority of section 636(c) in the latest judicial reporting year for which statistics are available were only 4 percent of all the federal trials during this period (6 percent of all civil trials). See Tables C-7 and M-5 in 1983 Annual Report, supra (year ending June 30, 1983). And judging from the more detailed figures available on this question for 1982, only 25 percent of these were trials of diversity cases, see Seron, The Roles of Magistrates in Federal District Courts 68 (Fed.Judic.Center, Dec. 1983) (table 20)--the class of case where section 636(c) is most vulnerable to constitutional attack. We should not deform the Constitution just to spare our district judges a 1 percent increase in trials, or even a 4 percent increase. (These are outside estimates; some litigants would settle their case rather than wait for a trial before a district judge, if trial by magistrate were unavailable.)
 
 
 51
 I mention the higher figure because, though we need go no further in this case than to strike down the statute as applied to diversity cases, I would not want to be understood to be implying that Congress could turn over the resolution of all questions of federal law to non-Article III trial judges, a position that would make deep inroads into section 1. The extent of its power in this regard--the subject of the interesting debate between Justices Brennan and White in Marathon, neither of whose opinions attracted the support of a majority of the Supreme Court--has not been settled. But we need not go into that here. Six members of the Supreme Court agreed in Marathon that Congress could not create a non-Article-III court to try a lawsuit that "seeks damages for breach of contract, misrepresentation, and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789. There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims of [the plaintiff] arise entirely under state law. No method of adjudication is hinted, other than the traditional common-law mode of judge and jury." 458 U.S. at 90, 102 S.Ct. at 2881 (concurring opinion); see id. at 71-72, 83, 102 S.Ct. at 2871-72, 2877 (plurality opinion). The present case is even clearer; there is no counterpart here to the argument in Marathon that Congress had used its bankruptcy power (Art. I, Sec. 8, cl. 4) to create an Article I court.
 
 
 52
 But maybe my analysis is too legalistic. Instead of taking the term "judges" in Article III as literally as I have been doing up to this point maybe I should ask why Article III gave "judges" the guarantees of independence it did, and if the answer is consistent with letting magistrates serve as judges, stop caviling. My brethren answer this question approximately as follows. Section 636(c) may seem to violate the letter of Article III but it has been carefully designed to comport with its spirit. The provisions on tenure and compensation in Article III have two purposes: to protect the interest of litigants in the quality of federal justice and to maintain the tripartite separation of powers. As long as trial by magistrate requires the consent of both parties, neither party can complain about being denied a trial by an Article III judge; and as long as the magistrates are appointed by judges, no one can complain that the legislative or the executive branch is encroaching on the judicial branch--on the contrary, the judicial branch is being enlarged.
 
 
 53
 I am sympathetic to functional analysis and to flexible, nonliteral constitutional interpretations, especially of a provision such as Article III that belongs to the original Constitution, which means it was written 197 years ago. But, speaking with great respect, I think my brethren's argument takes too narrow a view of the functions of the tenure and compensation provisions in several respects.
 
 
 54
 1. The citizens of this nation, even those fortunate enough not to be parties to federal litigation, have an interest in the quality of the administration of federal law (and, under the diversity jurisdiction for example, state law as well) by federal trial judges. Often the effects of a decision by such a judge are felt beyond the immediate parties to the litigation; and when exercising their section 636(c) powers, magistrates are federal trial judges. A magistrate might, for example, hold a state or federal statute unconstitutional. Of course he would not have the last word. But his decision, and the record he had shaped on which the decision rested, might influence the decision of the reviewing court. And it might be years before there was an appellate decision; in the interim the magistrate's declaration of unconstitutionality might affect legal and lay thinking. Or if a magistrate (or a jury in a trial presided over by a magistrate) awarded a huge damage judgment (or a tiny one) in a tort or contract or civil rights case, this could influence other judges; and a judgment is rarely overturned on appeal merely because the damage award seems excessive or inadequate. It is true that magistrates' opinions are not published in the Federal Supplement, as some district judges' opinions (though only a small fraction) are. But magistrates' opinions are public documents, not copyrighted, and any law publisher who thinks any of them worth publishing is free to do so.
 
 
 55
 It thus is not a good argument for the constitutionality of section 636(c) that parties to some disputes that could be litigated in a federal court can opt out of the federal court system, with its Article III judges, entirely, and submit their dispute to an arbitrator whose award would be enforceable in federal court subject to the narrowest possible judicial review. See United States Arbitration Act of 1925, as amended, 9 U.S.C. Sec. 10. Functionally as well as formally, the arbitration act does not confer Article III judicial powers on non-Article III judges; the effects of arbitrators' decisions on third parties are less than those of district judges', or magistrates', decisions. Arbitrators are not public officials--even ad hoc officials like masters--for they are appointed by the parties. They cannot enter judgments that are enforceable without a further legal proceeding. Their decisions carry no official imprimatur. They never hold statutes unconstitutional--indeed, they do not rule on questions of law at all. With rare exception, all that arbitrators do is interpret contracts.
 
 
 56
 There are 236 full-time federal magistrates and 212 part-time magistrates, who also have section 636(c) powers. See 28 U.S.C. Sec. 636(c)(1). The total number--448--is barely exceeded by the number of district judges in active service (499 at this writing). Of course all active district judges are full-time, and many senior district judges continue to conduct trials. And of course magistrates have many calls on their time besides trying cases under section 636(c). These are the reasons why, despite the almost equal number of magistrates and active district judges, the percentage of trials by magistrate is so low. The percentage will grow, though; and hundreds of magistrates trying hundreds--if the constitutionality of section 636(c) is confirmed, eventually thousands--of federal cases every year will not fail to affect the welfare of many people who never appear in federal court. Those people deserve the quality of federal justice that the tenure and compensation provisions of Article III were intended to ensure.
 
 
 57
 2. It is not only the citizenry that has an interest in the quality of federal justice. The states do, too; Article III, section 1 was adopted in their interest, too. This point is obvious when, as in this diversity case, the federal court must interpret and apply state law. The states have not consented to have issues of their own law determined by judges who do not have the guarantees of independence that Article III requires for federal judges. And they have not consented to have federal law interpreted and applied against them by judges who are not independent, but are the handmaidens of Congress or the President (or, for that matter, of other judges). This concern may seem hypocritical since no state gives its own judges such extensive guarantees of tenure and undiminished compensation as Article III gives federal judges. But it would not be inconsistent for a state to want the laws (its own laws, and federal laws impinging on it) to be interpreted by judges who are dependent on the electoral branches of its own government, while not wanting the laws to be interpreted by judges dependent on the electoral branches of another sovereign. This is why abolishing diversity jurisdiction would not be "throw[ing] out the baby with the bath water." In many federal cases, too, it might make a difference to the states which kind of federal judge was interpreting the law; a good example is National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).
 
 
 58
 3. The independence of the federal judiciary is as threatened by smothering Article III judges in non-Article-III auxiliaries as by vesting the judicial power of the United States directly in those auxiliaries, creating a corps of federal judges more dependent on Congress's good will than Article III judges are. Suppose Congress abolished all Article III judgeships as they fell vacant till only one Article III judge was left, and it then authorized a thousand law clerks to assist that judge in discharging his burdensome duties. There would no longer be an independent federal judiciary; the clerks would be the judges. (The difficulty that the Lord Chancellor had in supervising his masters in chancery before the reform of equity, see Baker, An Introduction to English Legal History 95-97 (2d ed. 1979), provides a foretaste of this problem.) Congress has not gone so far in section 636(c), and never will go so far. But the statute gives an almost complete set of Article III powers to hundreds of non-Article-III judges. And it is not true that just because the latter are appointed by Article III judges they are independent from Congress. They are not nearly so independent as Article III judges are. They serve limited terms (eight years for full-time, four for part-time magistrates, 28 U.S.C. Sec. 631(e)), at the expiration of which Congress can reduce their salaries, or abolish their offices (selectively if it wishes) so that the judges cannot reappoint them.
 
 
 59
 4. The fact that the appointing power has been given to Article III judges is the opposite of reassuring. It makes magistrates beholden to judges as well as to Congress. The separation of powers is not merely tripartite. The Constitution built internal checks and balances into the legislative branch by making Congress bicameral and into the judicial branch by guaranteeing all federal judges--not just Supreme Court Justices, or appellate judges generally--tenure during good behavior and protection against pay cuts. Appellate judges can reverse district judges, can mandamus them, can criticize them, can remand a case to another judge, but cannot fire district judges, cow them, or silence them--cannot prevent them from making independent judgments and expressing independent views. It is true that by giving the circuit Judicial Councils (composed mainly of circuit judges) the power to force retirement of a disabled judge who refuses to step down and the power to discipline (short of removal, however, see 28 U.S.C. Sec. 372(c)(6)(B)(vii)(I)) a misbehaving judge, 28 U.S.C. Sec. 372 has made inroads into the independence of judges from other judges. But the powers granted by section 372 have rarely been exercised; their constitutionality, although often taken for granted, see, e.g., In re Petition to Inspect and Copy Grand Jury Materials, 735 F.2d 1261 (11th Cir.1984); United States v. Claiborne, 727 F.2d 842, 846 (9th Cir.1984), and upheld recently in a district court decision, Hastings v. Judicial Conference of the United States, 593 F.Supp. 1371 (D.D.C. 1984), has not yet been authoritatively determined and is not beyond question, see Fishburn, Constitutional Judicial Tenure Legislation?--The Words May Be New, But the Song Sounds the Same, 8 Hastings Const'l L.Q. 843 (1981); Chandler v. Judicial Council of the Tenth Circuit, 398 U.S. 74, 136-43, 90 S.Ct. 1648, 1680-83, 26 L.Ed.2d 100 (1970) (dissenting opinions); and they raise somewhat different issues from those raised by section 636(c).
 
 
 60
 The diffusion of federal judicial power that has been brought about by parceling it out among many judges all of whom have Article III's tenure and compensation protections safeguards personal liberty--and I do not mean the judges'. A judicial system in which the judges at the top control the careers of the judges below them concentrates judicial power immensely. Judicial power is power; some believe the federal courts are already too powerful for their own good or that of the country. But until the current spate of cases upholding section 636(c), Article III seemed a barrier to making federal judges even more powerful by allowing them to appoint other judges whose subsequent careers they would control. It is true that the Constitution, while requiring presidential nomination and senatorial confirmation of the members of the Supreme Court, authorizes Congress to empower "Courts of Law" to appoint "inferior Officers." Art. II, Sec. 2, cl. 2. Presumably this includes the judges of the inferior federal courts, though that question need not be decided in this case. But as long as the judges so appointed enjoy the tenure and compensation protections of Article III, they are independent of the judges who appointed them; gratitude is not dependence. Magistrates do not have those protections; the judges control their reappointment.
 
 
 61
 The concerns I have listed do not prove that section 636(c) is a bad statute. They are speculative, and may well be outweighed by the contribution that section 636(c) is making to relieving the federal caseload crisis. Maybe section 636(c) is superior from a practical standpoint to clearly constitutional alternatives such as appointing more judges, abolishing diversity jurisdiction, or raising the price of access to the federal courts. Maybe, indeed, the first section of Article III is archaic and should be rewritten--but not by us. My point in reviewing the concerns that lie behind the tenure and compensation provisions is not to evaluate those concerns but only to show that the key safeguards of trial by magistrate under 28 U.S.C. Sec. 636(c)--requiring that the parties consent to trial by magistrate and vesting in Article III judges the power of appointing the magistrates--are not sufficiently responsive to those concerns to make the statute comport with the purpose (though in any event not text) of Article III. Maybe section 636(c) is a small violation of the Constitution. But the time to deal with this small violation is now, before it sends down roots. I doubt the utility of my brethren's suggestion that "the balance of constitutionality" may some day "mov[e] against the magistrate system" if long waits for trials before Article III judges coerce more and more litigants to accept trial by magistrate. It will be harder to enforce the Constitution against the excesses of the magistrate system when magistrates try 10 or 20 or 50 percent of the nation's federal trials--when every federal district is like the District of Oregon, and section 636(c) is indispensable to coping with the federal judicial workload--than it is today.
 
 
 62
 The plaintiff is entitled to have the judgment below set aside and the case remanded for a new trial, conducted by an Article III judge.
 
 
 
 [1]
 The Constitution authorizes Congress to vest the appointment "of such inferior Officers, as they think proper, ... in the Courts of Law." Article II, Sec. 2, cl. 2. An adjunct or inferior officer of a court would be one who is dependent on the Article III judges and does not have authority to independently exercise the judicial power. The consideration below of the values and purposes of Article III judicial protections assists in determining whether the magistrates are sufficiently dependent on Article III judges so as to be considered "inferior officers" and thus to exercise authority within constitutional limits
 
 
 [2]
 The dissent minimizes the significance of this provision by emphasizing the extraordinary circumstances required before a district judge may withdraw a reference to a magistrate. But this provision has not yet been fleshed out in judicial decisions. In this connection, we note that if this requirement were interpreted in such a way as to negate effective supervision of magistrates by district judges, the result might be unconstitutional. We are not now confronted with such a situation and therefore do not need to determine the precise standard by which to evaluate "good cause" or "extraordinary circumstances." This requirement might properly bear an interpretation which would not unconstitutionally restrict the power of district judges to supervise magistrates. Cf. United States v. Security Industrial Bank, 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982) (statute should be construed so as to avoid a constitutional question)
 
 
 [3]
 As a matter of theory, the authority to enter judgment is perhaps the most vulnerable aspect of section 636(c) because the authority diminishes the magistrate's dependence on the district court. However, in practice and especially in light of our discussion of standards of review, we think that the judgment entry power creates a distinction which may be seen as more formal than substantive